UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOSIAH K. WASHINGTON,                    )
                                         )
                Plaintiff,               )
                                         )
        v.                               )        No.  4:11CV1964 TIA
                                         )
CAROLYN W. COLVIN,[1]                    )
COMMISSIONER OF SOCIAL SECURITY,         )
                                         )
                Defendant.               )

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review

of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social

Security Act and Supplemental Security Income benefits under Title XVI of the Act.  The parties

consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On July 13, 2009, Plaintiff filed applications for Disability Insurance Benefits and

Supplemental Security Income Benefits, alleging that his disability began on July 8, 2006.  (Tr. 233-

38)  Plaintiff alleged that he was disabled due to depression and car accident injuries. (Tr. 89)  The

applications were denied on December 8, 2009, after which Plaintiff requested a hearing before an

Administrative Law Judge ("ALJ").  (Tr. 79-80, 89-94, 96)   On October 26, 2010, Plaintiff failed

to appear at his scheduled hearing before the ALJ, but the ALJ heard testimony from a vocational

expert ("VE").  (Tr. 62-78)   Plaintiff then testified at a hearing before the ALJ on December 21,

_____

[1]  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14,
2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is
therefore substituted for Michael J. Astrue as the Defendant in this action.

2010.  (Tr. 32-61)  In a decision dated March 18, 2011, the ALJ found that Plaintiff had not been

under a disability since July 13, 2009, the date he filed his application.  (Tr. 17-26)  The Appeals

Council denied Plaintiff's request for review on September 10, 2011.  (Tr. 1-3)  Thus, the decision

of the Appeals Council stands as the final decision of the Commissioner.

## II.  Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel.  The ALJ first noted

Plaintiff's absence at the October 26 hearing and noted that the ALJ took testimony at that time.  The

ALJ then questioned the Plaintiff, who stated that he had never married and had no children.  He was

32 years old at the time of the hearing.  He lived with different people in different places.  He obtained

his GED in 1999 after dropping out of high school in the ninth grade.  Plaintiff weighed 153 pounds

and measured 5 feet 6 inches.  He was able to read but could not perform simple arithmetic on the

spot at the grocery store.  Plaintiff could also write.  He was incarcerated from 1996 to 2006 for first

degree robbery and armed criminal action.  The only other jail time Plaintiff received was for traffic

tickets.  Plaintiff had no income but received food stamps at his cousin's address.  (Tr. 35-41)

Plaintiff further testified that he last tried to work for a catering service the previous year.  He

was unable to perform the job, which required carrying trays.  He stated that the trays would weigh

down his right side and cause sharp, shooting pains through his leg and back.  He was fired because

he dropped things.  Plaintiff also had worked at Denny's as a dishwasher, busboy, and cook.

Additionally, Plaintiff worked in landscaping, in hardware, and for a cleaning company.  Other jobs

over the previous 15 years included independent work helping people move, cleaning out buildings,

and doing yard work.  (Tr. 41-44)

Plaintiff stated that his back problems impacted his ability to work. He had never had surgery but did receive chiropractic care. Mitchell Davis came to Plaintiff's home to provide back therapy because Plaintiff was unable to move around. In addition to back problems, Plaintiff had pain in his legs. In his right leg, the pain radiated from his hip to his ankle. In his left leg, the pain was around his thigh area. Plaintiff used a cane that was not prescribed by a doctor. He stated that no one would see his leg for real due to lack of insurance. (Tr. 44-45)

Further, Plaintiff testified that in 2009, he stayed with his cousin and allowed his cousin to use his name in order to receive gas and electricity. Plaintiff's hobbies included playing chess, watching TV, riding bikes, playing video games, and using a computer. Plaintiff played chess with two of his cousins and played sports games on Xbox. (Tr. 45-46)

Plaintiff was not currently taking prescription medications because he ran out. He continued to smoke but did not drink alcohol because he did not like it. He had tried marijuana but no other illegal drugs. The ALJ noted that Plaintiff's Hopewell Center records indicated a history of alcohol and marijuana use, and SLUcare records showed binge drinking every six months. Plaintiff stated, however, that the SLUcare record was a mistake because he never went on drinking binges. Plaintiff did not have a driver's license. (Tr. 46-49)

With regard to activities, Plaintiff testified that he was able to cook normal dishes. He could wash dishes both by hand and with a dishwasher. Plaintiff had done his laundry in the past, but recently his sister helped him. He no longer did yard work. He purchased groceries with food stamps. Plaintiff stated that, if a person would let him spend the night, he would purchase food for them to eat. Plaintiff used public transportation to get around. He could walk seven to 13 minutes without slowing down before his legs would start acting up. He could sit for an hour but sometimes

needed to prop his leg up to stretch. He could not lift heavy items, and he stated that 20 pounds was heavy to him. He believed he could lift about 14 pounds. (Tr. 49-52)

Plaintiff's attorney also questioned him about his ability to lift. Plaintiff clarified that he could not lift 14 pounds frequently. He could lift that weight for about 1/3 of the day, but he would experience pain. Plaintiff reiterated that he ran out of prescription medication. He had an appointment to pick up refills on January 6. Plaintiff's medications included Risperadal, Lexapro, and Cogentin for depression. Plaintiff's symptoms of depression were not as heavy during the hearing. His symptoms included feeling sad and alone all the time. He had crying spells periodically, more frequently before he started seeing a counselor. Plaintiff stated that he saw a counselor, Jason Herndon, every week through St. Louis University Psychological Center. Plaintiff had difficulty concentrating and getting along with others. He explained that he thought people were talking about him. He would become angry and could not control himself around others. Plaintiff got into fights with people, and his last fight was two months ago. Three people jumped him, and he found them one by one and got "wrecked" with them. Besides Jason Herndon, Plaintiff saw Dr. Hossfeld at Hopewell for prescriptions, which Plaintiff retrieved at People's Clinic. (Tr. 52-58)

At the close of the hearing, Plaintiff's attorney asked the ALJ to keep the record open for 30 days. The attorney wanted to follow up with the People's Clinic and Jason Herndon for additional medical records. (Tr. 58-60)

During a previous hearing held October 26, 2010, the VE testified regarding the existence of jobs which Plaintiff could perform in the State of Missouri and the national economy. The VE noted Plaintiff's past work as a dishwasher, busboy, cook's helper, and prep cook, which fell under the category of kitchen helper. As Plaintiff performed those jobs, they were heavy exertion. However,

jobs existed in the national economy that were medium level and unskilled. Plaintiff also worked in production-type jobs, which were heavy to very heavy as performed and medium in the national economy. These jobs were also unskilled. Finally, Plaintiff's cleaning jobs were medium and unskilled. (Tr. 70-71)

The ALJ then asked the VE to assume a hypothetical individual with Plaintiff's education, training, and work experience who could perform light work. Limitations included climbing stairs and ramps occasionally; climbing ropes, ladders, and scaffolds never; understanding, remembering, and carrying out at least simple instructions and non-detailed tasks; demonstrating adequate judgment to make simple, work-related decisions; adapting to routine, simple work changes; and performing repetitive work, according to set procedures, sequence, and pace. Given this hypothetical, the VE testified that the individual could not perform any of Plaintiff's past work. However, he could work as a bagger of clothing or remnants, which was light and unskilled. He could also perform work as a cleaner in housekeeping, which was also light and unskilled. (Tr. 71-72)

For the second hypothetical, the ALJ deleted the mental limitation of demonstrating adequate judgment to make simple, work-related decisions and added responding appropriately to supervisors and co-workers in a task-oriented setting, where contact with others was casual and infrequent. The changes to the hypothetical did not impact the jobs about which the VE previously testified. In the third hypothetical, the ALJ added to hypothetical two that the person would not be able to maintain concentration and attention for two hour segments over an eight hour period. The VE answered that the individual would be unable to maintain a regular job. (Tr. 72-73)

The Plaintiff's attorney also examined the VE and asked the VE to revisit the first hypothetical with the additional limitation that, twice a month, the person had a problem maintaining attention and concentration for two hour segments such that he was not getting his work done. In addition, twice a month he had problems working with or near other people and became distracted, causing him to be off task. He also needed extra rest periods and breaks, and he had problems dealing with supervisors and getting along with co-workers. He was either distracting his co-workers or exhibiting behaviors that distracted them. The VE answered that in light of those limitations, the person may get hired but would be terminated shortly thereafter. (Tr. 73-75)

The VE then stated that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"), except where he explained inconsistencies. (Tr. 76)

In a Function Report – Adult dated August 7, 2009, Plaintiff reported that he was homeless and spent his time walking around, talking to himself, and looking for food, a place to wash up, and shelter. Plaintiff stated that he previously masked his behavior but had been psychologically sick for a long time. He had problems understanding and talking. He had problems sleeping and thought about his death. He stopped caring about his personal grooming. Plaintiff was able to prepare meals but mostly ate on the go. He could do all household chores but had no home. He spent time with family but was too shy and quiet to have a social life. His conditions affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, stair climb, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. Plaintiff reported that he could walk 45 minutes before needing to rest for 20 minutes. He did not finish what he started and could not follow spoken instructions well. He could follow written instructions that he understood. He got along with

authority figures but did not handle stress or changes in routine very well. He stated that his application was strictly for his depression, as he had a lawyer for his car accident. (Tr. 266-73)

### III. Medical Evidence

In a letter dated September 3, 2010, Phyllis Terry Friedman, Director of the Psychological Services Center at St. Louis University, stated that between February 13 and June 23, 2009, Plaintiff attended twelve therapy sessions with Ryan Hooper, M.S., for treatment of severe depression and stressors related to lack of housing and joblessness. (Tr. 535)

On June 10, 2009, Rolf Krojanker, M.D., saw Plaintiff for a psychiatric evaluation. Plaintiff was responsive but vague, with some evidence of unusual ideations. He had inadequate insight into problems, issues, and social judgment. In addition, Dr. Krojanker noted that Plaintiff had a medium threat risk to himself and others. Dr. Krojanker further stated that Plaintiff had been on Paxil but said it had almost killed him. Plaintiff requested Lexapro after Dr. Krojanker had described it to him. Dr. Krojanker noted that Plaintiff had been seeing Ryan Hopper, a psychologist, for his depression. Plaintiff smoked Kools and new pots. Dr. Krojanker diagnosed depressive affective disorder with psychotic features, partial compliance, psychosocial stressors, and a Global Assessment of Functioning (GAF) score of 30.[2] He also prescribed Lexapro and advised Plaintiff to return in a month. (Tr. 363)

In an intake assessment on the same day, K. L. Brownridge, M.A., Q.M.H.P., observed that Plaintiff had questionable personal hygiene. He spoke clearly, with relevant and logical thought

---

[2] A GAF of 21-30 indicates behavior that "is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home or friends). Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).

processes. His speech was vague with some evidence of unusual ideations. Plaintiff had inadequate insight into his problems and issues, and his social judgment was also inadequate. In addition, Plaintiff had no real understanding of his illness. K. L. Brownridge assessed a GAF of 45.[3] (Tr. at 365-368)

On July 8, 2009, Dr. Krojanker noted that Plaintiff had experienced some improvement on Lexapro, but still needed to learn to be around other people and interact verbally with them. Plaintiff complained of low energy. Dr. Krojanker recommended that Plaintiff attend Emotions Anonymous and Dr. Krojanker's RSAA meeting, but Plaintiff did not think he could afford bus fare. Dr. Krojanker prescribed a Lexapro refill, although Plaintiff did not have the money to refill the prescription at that time. (Tr. 364)

On September 10, 2009, a Hopewell social worker noted that Plaintiff's mood was dysphoric; his affect was flat; he admitted having tactile and auditory hallucinations and flashbacks; his mood was agitated with some paranoia; his sleep and appetite were poor; his insight and judgment were fair; and he would benefit from an increase in medication. (Tr. 415)

On three occasions between August and October 2009, Plaintiff saw Caroline Day, M.D., at Family Care Health Center. (Tr. 442-49) On August 12, 2009, Dr. Day assessed localized osteoarthritis of the knee; delusional (paranoid) disorder; and depression. She noted that Plaintiff's paranoid thoughts could be related to his prior incarceration. (Tr. 448-49) On October 14, 2009, Dr. Day stated that Plaintiff was doing better on Lexapro and Risperadone. Plaintiff continued to

---

[3] A GAF of 41-50 demonstrates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV-TR 34.

smoke 1 to 2 packs of cigarettes a day. A notation regarding alcohol use also states, "limit binge drinking once every 6 mos." (Tr. 442-43)

On December 7, 2009, agency reviewing psychologist R. Rocco Cottone, Ph.D., completed a Psychiatric Review Technique form. Dr. Cottone found that Plaintiff had the Affective Disorder of depression that did not satisfy the diagnostic criteria of the listing. With regard to functional limitations, Dr. Cottone opined that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. In an accompanying Mental Residual Functional Capacity Assessment, Dr. Cottone noted marked limitations in Plaintiff's ability to understand and remember detailed instructions and ability to carry out detailed instructions. Further, Plaintiff had moderate limitations in his ability to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; to complete an ordinary workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to accept instructions from and respond appropriately to criticism from supervisors; to get along with coworkers and peers without distracting them or exhibiting behavioral extremes. Dr. Cottone summarized that Plaintiff could understand, remember, carry out, and persist at simple tasks; make simple work-related judgments; relate adequately to co-workers or supervisors; and adjust adequately to ordinary changes in work routine or setting. (Tr. 450-61)

Progress notes from Hopewell dated December 30, 2009 revealed that Plaintiff felt like he was crawling out of his neck. He was sleeping three hours a night and was out of Lexapro and Risperdal. His psychomotor activity was decreased; his speech was soft and slow; and his mood and affect were

depressed. The diagnosis was depressive affective disorder with psychotic symptoms and a GAF score of 40.[4]  (Tr. 466)

On January 13, 2010, Plaintiff had been off Lexapro for several weeks.  Neurological exam revealed dysphoric and irritable mood with flat affect.  Plaintiff reported suicidal thoughts but no plan. Dr. Day assessed paranoid schizophrenia; delusional (paranoid) disorder; and depression.  (Tr. 487-88)  On March 16, 2010, Dr. Day saw Plaintiff in follow-up for depression and paranoid schizophrenia.  Plaintiff reported that he was "doing ok" on his medication and was taking the medication consistently, but he felt that the voices he heard were not well controlled.  Dr. Day assessed localized osteoarthritis of the right knee; paranoid schizophrenia; delusional (paranoid) disorder; depression; and scabies.  She prescribed medications for his skin.  (Tr. 484-86)  On April 9, 2010, Dr. Day noted that Plaintiff was unable to obtain medications on his last visit to the pharmacy because he had no cash.  Dr. Day further noted that Plaintiff was living in an abandoned home and sleeping on the floor. He woke up with low back and hip pain.  He was uncomfortable in shelters due to concern for his safety.  (Tr. 563-64)

On June 11, 2010, Plaintiff saw Mollie Hossfeld, M.D., at People's Health Center for a physical exam, psychosis, and myalgias.  Dr. Hossfeld noted that Plaintiff's last appointment at Hopewell was in April 2010 but that he had a follow up appointment scheduled for August.  Plaintiff reported that he saw a psychologist weekly and was recently fired from a job due to knee and back pain.  Plaintiff's psychiatric exam revealed appropriate interaction, difficulty concentrating, and

---

[4]    A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . .)."  DSM-IV-TR 34.

psychiatric symptoms.  Dr. Hossfeld assessed unspecified psychosis, depressive disorder NEC, joint pain of the left leg, and lumbago.  She prescribed Citalopram and Haldol and advised Plaintiff to follow up with Hopewell Psychiatry as scheduled and with a psychologist weekly.  (Tr. 571-76)

According to a treatment summary dated March 11, 2011, Plaintiff received treatment from clinician Jason Herndon, B.A., from July 16 through November 12, 2010.  (Tr. at 578-581)  Mr. Herndon stated that Plaintiff had initially presented with concerns about his employment situation and knee injury that prevented him from working.  Plaintiff was also dissatisfied with his current psychotropic medication, which was not as effective as previous medications.  However, he took his medications inconsistently, believing the medicine had no effect on him.  He endorsed suicidal ideation but had no plans to hurt himself or others.  Plaintiff was currently homeless, sleeping in abandoned houses or on the street.  (Tr. 578)

Mr. Herndon provided initial and current diagnoses of Major Depressive Disorder, recurrent, severe, with psychotic features; Posttraumatic Stress Disorder, chronic; and a GAF score of 52.[5]  Mr. Herndon indicated that Plaintiff initially wanted to focus on his interpersonal interactions with others, mainly women.  When he was compliant with medication, he showed improvement in his mood, though he continued to endorse significant psychological distress.  Plaintiff also began to discuss his childhood trauma and its affect on his daily functioning.  Plaintiff then abruptly stopped treatment for about four months, returning in October 2010.  He had lost his job, stopped taking his medicine, and experienced a decline in mood and functioning.  According to Mr. Herndon, Plaintiff appeared more irritable, withdrawn, and frustrated, reporting that he often felt irritated by those around him.  Mr.

---

[5]   A GAF score of 51 to 60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning."  <u>DSM-IV-TR</u>) 34.

Herndon observed his low tolerance for frustration and a marked lack of coping mechanisms. In addition, Plaintiff displayed marked difficulty in handling his affairs, reporting that did not have the knowledge or patience to find another doctor, to access his previous medical and psychological records, or to apply for disability. He endorsed continuing suicidal ideation and a desire to physically lash out at others he perceived as threatening or frustrating. Mr. Herndon noted that as Plaintiff discontinued medication, his psychotic symptoms began to resurface. Plaintiff reported auditory hallucinations on an inconsistent but gradually increasing basis. Plaintiff also reported past visual hallucinations, stating that the images and voices were becoming more controlling and encouraged him to attempt suicide. (Tr. 578-79)

Mr. Herndon added that Plaintiff consistently experienced an extreme amount of psychological distress as evidenced by an objective, self-report measure of psychological distress, the Outcome Questionnaire-45 (OQ-45). Plaintiff's scores on the OQ-45 typically ranged from 120 to 150, more than double the accepted cutoff score of 63. Further, Mr. Herndon noted that Plaintiff's self-reported level of distress did not significantly decrease when he was taking his medication, although his depressive and psychotic symptoms did markedly increase when he was noncompliant. Mr. Herndon stated that Plaintiff consistently reported increased irritability, lack of motivation, hypervigilance, difficulty sleeping, auditory and visual hallucinations, and physical sequelae associated with Major Depressive Disorder with psychotic features and Posttraumatic Stress Disorder. Additionally, Plaintiff's low tolerance for frustration, lack of coping mechanisms, and interpersonal difficulties were equally pervasive. (Tr. 579) Mr. Herndon's summary does not indicate the total number of counseling sessions attended by Plaintiff. Plaintiff's counsel submitted Mr. Herndon's curriculum vitae to the Appeals Council, but the ALJ did not view Mr. Herndon's credentials. (Tr. 580-81)

On August 6, 2010, Dr. Krojanker completed a Mental Medical Source Statement at the request of Plaintiff's attorney. Dr. Krojanker opined that Plaintiff had marked limitations in activities of daily living, including the ability to cope with normal work stress, function independently, and behave in an emotionally stable manner. Dr. Krojanker also noted marked limitations in social functioning, including the ability to relate in social situations, interact with the general public, accept instructions and respond to criticism, and maintain socially acceptable behavior. With regard to maintaining concentration, persistence, and pace, Dr. Krojanker opined that Plaintiff had moderate limitations in his ability to understand and remember simple instructions. He had marked limitations in his ability to make simple work-related decisions, maintain attention to work tasks for up to two hours, perform at a consistent pace, sustain an ordinary routine without special supervision, respond to changes in work setting, and work in coordination with others. Dr. Krojanker placed a question mark when asked whether Plaintiff's medically determinable impairment would cause unpredictable work interruptions, and he opined that the possible interruptions could occur once every two weeks, lasting one hour, before Plaintiff could return to work. Further, Dr. Krojanker questioned whether Plaintiff would be absent or tardy once a month. Dr. Krojanker did not provide an onset date but stated that Plaintiff's condition was chronic. However, he had not seen Plaintiff in over a year. (Tr. 530-33)

On February 18, 2011, Mr. Herndon completed a Mental Medical Source Statement, opining that Plaintiff had marked limitations in his ability to cope with normal work stress, behave in an emotionally stable manner, relate in social situations, and interact with the general public. Plaintiff had moderate limitations in his ability to function independently, accept instructions and respond to criticism, and maintain socially acceptable behavior. Mr. Herndon did not appear to comment on

Plaintiff's ability to concentrate, although the boxes contain some light markings. He stated that the onset of Plaintiff's disability was before August 11, 2009, lasted or could be expected to last 12 continuous months, and was cyclical in nature. Mr. Herndon repeated his previous diagnosis, noting that the cyclical nature of Plaintiff's impairments increased the chances of unpredictable disturbances in a work setting. However, Plaintiff could successfully work if he was aware of his symptoms and took the appropriate psychotropic medication. In the absence of appropriate medication, however, Mr. Herndon opined that Plaintiff's symptoms could potentially increase in severity, thereby decreasing his work and/or daily functioning. (Tr. 566-69)

## IV. The ALJ's Determination

In a decision dated March 18, 2011, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since his July 13, 2009 application date. His severe impairments included osteoarthritis of the right knee, patellofemoral syndrome, cervical spondylosis, depression, and a post-traumatic stress disorder. However, his impairments or combination of impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 19-20)

After carefully considering the record, the ALJ determined that the Plaintiff had the residual functional capacity ("RFC") to perform light work with the following non-exertional limitations: he could only occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl; he could never climb ropes, ladders, or scaffolding; he could understand, remember, and carry out at least simple instructions and non-detailed tasks; he could respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others was casual and infrequent; he could adapt to routine, simple work changes; and he could perform repetitive work according to set procedures,

sequence, or pace. The ALJ assessed hearing testimony, medical records concerning physical impairments, and mental health medical records. Based on Plaintiff's younger age, GED certificate, work experience, and RFC, the ALJ found that jobs existed in the national economy which Plaintiff could perform. Such jobs included bagger of clothing and cleaner (housekeeping), as the VE testified. Thus, the ALJ concluded that Plaintiff was capable of making a successful adjustment to work that exists in significant numbers in the national economy and was therefore not disabled under the Social Security Act. (Tr. 20-26)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable

mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the <u>Polaski</u>[6] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. <u>Marciniak</u>, 49 F.3d at 1354.

## VI. Discussion

Plaintiff raises two arguments in his Brief in Support of the Complaint. First, Plaintiff asserts that the ALJ erred in his evaluation of the opinions from clinician Jason Herndon. Next, Plaintiff argues that the ALJ erred in his assessment of Dr. Krojanker's opinions. Defendant, on the other hand, contends that the ALJ properly evaluated the opinions of Mr. Herndon and Dr. Krojanker and properly determined that Plaintiff was not disabled. The undersigned finds that substantial evidence supports the ALJ's determination, and the decision of the Commissioner denying benefits should be affirmed.

### A. Evaluation of Clinician Jason Herndon's Opinions

Plaintiff argues that the ALJ erroneously rejected Mr. Herndon's opinions because Mr. Herndon did not enumerate his specific credentials and because Mr. Hernon was not an "acceptable medical source." The record shows that Plaintiff met with Mr. Herndon between July and November

---

[6]The <u>Polaski</u> factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984).

of 2010.  (Tr. 578)  The record is unclear, however, about the number of visits, and Mr. Herndon mentioned a four month absence prior to October 2010.  Further, Mr. Herndon's curriculum vitae demonstrates that he had a bachelor's degree in psychology and expected to receive an M.A. in clinical psychology and an M.S. in public health in the future.  (Tr. 580)  In addition, his position with SLU while treating Plaintiff was "psychological trainee."  (Id.)

The ALJ may consider evidence regarding the severity of a plaintiff's impairment and how it affects his or her ability to work including medical sources such as nurse-practitioners, physicians' assistants, chiropractors, and therapists.  20 C.F.R. § 404.1513(d)(1).  While the ALJ could, and indeed did, consider Mr. Herndon's opinions under the regulations, the ALJ was not obligated to give the opinions controlling weight.  (Tr. 23)  See Social Security Ruling, SSR 06-03p, 71 Fed. Reg. 45593-03 (Aug. 9, 2006) (distinguishing between "acceptable" and "not acceptable" medical sources and stating that only "acceptable medical sources" can provide evidence to establish the existence of a medically determinable impairment, give medical opinions, and can be considered treating sources whose opinions may be entitled to controlling weight).  Contrary to Plaintiff's assertion, the ALJ did not summarily dismiss Mr. Herndon but included the opinions in Plaintiff's RFC determination.  Indeed, Mr. Herndon assessed a GAF score of 52, indicating moderate symptoms and not the marked symptoms in the checked boxes.  Further, Mr. Herndon stated that Plaintiff was capable of successfully working when compliant with his medications.  Therefore, while the record shows that the ALJ considered the opinions, he was not obligated to give them controlling weight.  Summers v. Astrue, No. 1:09CV179 DDN, 2011 WL 665677, at *5 (E.D. Mo. Feb. 14, 2011).

## B.  Evaluation of Dr. Krojanker's Opinions

Plaintiff next argues that the ALJ erred in evaluating the opinions of Dr. Krojanker, Plaintiff's treating physician.  Specifically, the Plaintiff contends that the ALJ failed to give Dr. Krojanker's Mental Medical Source Statement appropriate weight or consider that the statement was consistent with other evidence in the record.  Defendant maintains that the ALJ considered this opinion but properly gave it little weight, as it was unsupported by objective medical findings.  The undersigned agrees.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted); see also SSR 96-2P, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.").  The ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment.  Goetz v. Barnhart, 182 F. App'x 625, 626 (8th Cir. 2006).  Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements."  Swarnes v. Astrue, Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted).

Here, Plaintiff's mental health treatment was sporadic, at best.  The record indicates that Plaintiff saw Dr. Krojanker only twice, and that Dr. Krojanker had not evaluated Plaintiff for over a year when he submitted the Mental Medical Source Statement.    Thus, the Court questions

whether Dr. Krojanker constitutes a treating physician. "Generally, the longer a treating source has treated [claimant] and the more times [claimant] has been seen by a treating source, the more weight we will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(i). Indeed, the treatment notes fail to demonstrate that Dr. Krojanker had sufficient knowledge of Plaintiff's impairments to formulate an opinion regarding his ability to function in the workplace. See Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) (discrediting physician's medical opinion where the physician had only met with plaintiff on three occasions); see also 20 C.F.R. § 404.1527(c)(2)(i) and 20 C.F.R. § 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more time you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

Despite Dr. Krojanker's opinion that Plaintiff had marked limitations in most areas of functioning, his treatment notes did not reflect symptoms of such severity that would preclude him from performing any work. After Dr. Krojanker prescribed Lexapro, Plaintiff reported improvement. Dr. Krojanker recommended group therapy, which Plaintiff did not appear to follow. (Tr. 364) Indeed, while Plaintiff displayed some severe symptoms in his first session, nothing in Dr. Krojanker's subsequent treatment notes indicates the marked level of restriction Dr. Krojanker provided in his opinion. In fact, the treatment notes mention no restrictions to Plaintiff's activities and strongly encouraged him to attend meetings in a group setting. See Choate v. Barnhart, 457 F.3d 865, 870-71 (8th Cir. 2006) (finding that ALJ properly discredited physician's Medical Source Statement where treatment notes never mentioned restrictions or limitations to the plaintiff's activities). The ALJ thoroughly evaluated Dr. Krojanker's opinion but correctly gave this opinion little weight because Dr. Krojanker had not seen Plaintiff in over a year and because Plaintiff had been noncompliant with his medications. "An impairment which can be controlled by treatment or

medication is not considered disabling." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted); see also Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009) ("There is substantial evidence that, when taken as directed, the medication [plaintiff] was prescribed was successful in controlling his mental illness.").

Further, the record shows that Dr. Krojanker's opinion was inconsistent with other medical opinions. For example, Dr. Friedman noted that Plaintiff's depression and stressors were related to his lack of housing and joblessness. (Tr. 24, 535) Depression due to situations such as economic or employment factors supports a finding that the impairment does not result in significant functional restrictions. Dunahoo v. Apfel, 241 F.3d 1033, 1039-1040 (8th Cir. 2001); Shipley v. Astrue, No. 2:09CV36MLM, 2010 WL 1687077, at *12 (E.D. Mo. April 26, 2010). In addition, Dr. Day noted that his paranoia could be related to his incarceration and that Plaintiff improved with medication. (Tr. 22-23, 484) Dr. Hossfeld also noted during Plaintiff's exam that he displayed appropriate interaction, with some difficulty concentrating and some psychiatric symptoms. She provided no restrictions and recommended medication and continued therapy. (Tr. 23, 571-74)

Contrary to Plaintiff's assertion, the Court finds that Dr. Krojanker was not a treating physician under the regulations and was not entitled to controlling weight. Further, the opinion was inconsistent with other medical evidence in the record, and with Dr. Krojanker's own treatment notes. Finally, while the ALJ could, perhaps, have written a better opinion, arguably deficient opinion-writing does not require the court to set aside an ALJ's decision when the deficiency has no bearing on the outcome. Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008).

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of March, 2013.